IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONALD T. ALLGOOD,

                Plaintiff,                      OPINION AND ORDER

v.

                                                    23-cv-885-wmc

ST. CROIX COUNTY, ST. CROIX COUNTY
SHERIFF'S OFFICE, CHASE DURAND,
SCOTT KNUDSON, BRYCE FAYWEATHER,
FREDERICK MANGINE, ERIC JOHNSON and
JOEL BENSON,

                Defendants.

Plaintiff Ronald Allgood was bitten and injured by a police dog during his arrest by several St. Croix County sheriff's deputies. Allgood claims that the deputy responsible for the K-9 violated his Fourth Amendment rights by using unreasonable force, as did the other deputies on the scene by failing to intervene to prevent the unreasonable use of force. Before the court is defendants' motion for summary judgment (dkt. #37), arguing that their use of force was reasonable under the circumstances, but even if not, they are entitled to qualified immunity. Because Allgood has failed to identify any controlling law clearly establishing that defendants' actions violated the Fourth Amendment, the court agrees that they are entitled to qualified immunity and will enter summary judgment accordingly.

UNDISPUTED FACTS[1]

On November 7, 2022, defendant Chase Durand, a sergeant in the St. Croix County Sheriff's Office and the patrol shift supervisor at the time, received a request for assistance

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as from the record evidence where appropriate. The court recounts the facts in the light most favorable to plaintiff, *McGee v. Parsano*, 55 F.4th 563, 566 (7th Cir. 2022), although many of the facts are undisputed

with an arrest from a Village of Hammond police officer.[2]  Specifically, the Hammond officer told Sergeant Durand that while trying to arrest plaintiff Ronald Allgood on a felony warrant for making threats to law enforcement, he threatened to snap the officer's neck.  The officer also told Durand that Allgood had a lengthy history of contacts with law enforcement and had been aggressive with Village of Hammond law enforcement officers in the past.  During the discussion, Durand ran Allgood's name though his squad car computer and confirmed the existence of the felony warrant.

Under St. Croix County Sheriff Office's policy, the county routinely provided assistance to other law enforcement agencies within its jurisdiction, including the Village of Hammond.  Considering Allgood's apparent contentious history with Village officers, however, Durand decided that the St. Croix County Sheriff's Office should handle the arrest directly.  After being informed of Durand's plan, Sheriff Scott Knudson warned Durand and defendant Bryce Fayerweather, a deputy sheriff also working the patrol shift, about a previous incident in which he and other St. Croix County Sheriff deputies, including a K-9 officer and his dog, attempted to take Allgood's son into custody,

---

because much of the incident was captured by defendants' body-worn cameras.  *See Horton v. Pohjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (at summary judgment, court must view the facts in the light most favorable to the nonmovant," but should "rely on clear and conclusive videos if they 'firmly settle a factual issue.'") (citation omitted).

[2] Plaintiff proposed several findings of fact relating to the Village of Hammond police officer who issued the initial criminal complaint, accusing the officer of falsifying information and retaliating against plaintiff.  However, that officer is not a defendant in this case, and those facts are irrelevant to the Fourth Amendment claims against the St. Croix County Sheriff's Office defendants.  Plaintiff also alleges that the same Village of Hammond officer instructed Durand to use force and/or injure plaintiff while arresting him (Plt.'s PFOF (dkt. #55) ¶ 11), but he has no evidence to support that assertion.

prompting Allgood to produce a knife and threaten deputies with it.[3] After speaking with the sheriff, Durand decided to request assistance from additional deputies, as well as one of the Sheriff Department's K-9 handlers. Defendants Joel Benson and Eric Johnson, both deputy sheriffs, responded to Sergeant Durand's request for additional assistance, and Durand also asked defendant Deputy Fred Mangine and his K-9 partner "Ash" to meet at Allgood's residence.

While en route to the residence, Sheriff Knudson radioed Deputy Mangine and relayed that during a previous incident, Allgood had threatened to use a knife to stab a K-9 officer. Deputy Mangine also reviewed Allgood's history, noting several past encounters with law enforcement in which he was described as extremely angry, verbally abusive, or threatening. That history further included reports of noncompliance and resisting while being arrested, including a recent encounter with law enforcement in which Allgood attempted to flee in a vehicle from the residence.

Defendants Durand, Fayerweather, Benson and Johnson all parked at the Village of Hammond Police Department, which was near Allgood's residence. When Durand approached Allgood's home with Deputies Fayerweather, Benson and Johnson on foot, Allgood was outside of his house in a fenced-in area of his yard.[4] While standing outside

---

[3] Allgood denies that he actually threatened officers with a knife, saying that he only touched a knife on his kitchen counter because officers were not listening to him. (Allgood Dep. (dkt. #19) 80–81.) Whether Allgood actually threatened officers with a knife is immaterial to this case, however, because the relevant question for the Fourth Amendment analysis is what information was *communicated* to Sergeant Durand and Officer Fayerweather before they encountered Allgood, and there appears no dispute on that score.

[4] Each deputy was wearing a body camera that recorded portions of Allgood's arrest. Thus, the court's description of what happened during the arrest is drawn primarily from the recorded footage, unless noted otherwise.

3

the fenced in yard, Durand stated, "Hey Ronald, can I chat with you for a minute?" Allgood responded by waving his hand in the air and saying, "Be right there." However, he was also shaking his head back and forth and walking toward the door leading into the house. Durand then said, "Step over here please, alright?" Allgood then stopped and asked Durand, "Why are you here?" At that point, Durand responded, "We're here because you have a warrant for your arrest." Allgood asked what the warrant was for, and Durand responded that the warrant was signed by a judge, and they could discuss the warrant "in a bit." When Allgood did not move toward the deputies, Durand ordered, "Come here, Ronald." Instead, Allgood went inside the residence through a nearby door.

The deputies next positioned themselves in various locations around Allgood's fence. Defendant Johnson stood outside of a tall fence near the door that Allgood had just entered, and began attempting to speak with Allgood, stating: "Come on out. We've got a warrant, come on out, okay?" Allgood then came back out of his residence through the same door, along with a woman, and stood on the patio arguing with Johnson. As Allgood argued with Johnson, Sergeant Durand radioed dispatch to reconfirm that there was still a valid warrant for Allgood. Dispatch then confirmed Allgood's outstanding felony warrant for "battery or threat to judge, prosecutor or law enforcement."

After close to a minute of Allgood arguing back and forth with deputies from his porch, Sergeant Durand advised in a loud voice, "Hey Ronald. You have a felony warrant. We'll be coming inside to arrest you if you don't comply. Step this way." Around this same time, Durand drew his gun, holding it low and toward the ground. Allgood again asked what the warrant was for, and Durand responded, "Threats to law enforcement. Step

4

this way." Allgood responded, "No, you tell me what it's for." Durand repeated again, "Threats to law enforcement. Step this way, Ronald."

Meanwhile, Deputy Mangine was driving with K-9 Ash towards Allgood's residence and heard over the radio that deputies had made contact, but Allgood was not complying with orders. When Mangine and Ash arrived, therefore, they immediately headed to the fence line where Deputy Johnson was already positioned. As Mangine approached the fence, he could see and hear Allgood arguing with Johnson. Mangine next said to Allgood, "Come on surrender, or I'm going to throw the dog over and he's going to bite you. Come out and surrender now." At this point, Allgood went back into his residence through the same door he had used earlier. Johnson announced that Allgood was locking the door, causing Mangine to retrieve his 20-foot leash and secure K-9 Ash so that he could be deployed, if necessary.

Sergeant Durand then hopped the short fence at the front of the residence and approached the same door that Allgood had been using. Defendant Fayerweather also followed Durand into the fenced-in portion of the yard. From there, Durand radioed dispatch to advise that Allgood had barricaded himself in the residence and to ask if Allgood had "a history," presumably beyond what he had already been told. Deputy Mangine and K-9 Ash then similarly hopped the short fence into the yard. While Deputy Johnson continued directing Allgood to exit, saying, "Ronald, come on out," at least three times, Allgood again exited the house through the same door, almost a minute since he had last entered, and stood on his patio, holding a phone up,

At this point, Durand commanded, "Step over here, Ronald," while Johnson calmly repeated, "Yep. Just step on over, Ronald." When Allgood responded, "You won't tell me

5

what it's for?" Durand said simply, "You're under arrest, get on the ground. Get on the ground." Allgood initially appeared to begin raising his hands, but simultaneously said to the deputies, "Shoot! Shoot first! Let me take care of my business first," then he again retreated into his residence. As Allgood retreated, Durand also ordered, "Ron, stop right there."

After only a few seconds, Allgood reemerged for a third time, stepping one foot out of the door, causing Durand to repeat, "Step over here. You're under arrest! Step out!" Defendant Mangine and K-9 Ash approached the door and Mangine announced, "Sheriff's Office K-9, stop! I'm going to send the dog in, you may be bit! Stop!" Nevertheless, Allgood once more retreated into his house, slamming and locking the door behind him. Durand again shouted through the door, "Step out, Ronald!" Johnson radioed dispatch and advised that Allgood had gone back into the residence and had locked the door again.

From his vantage point looking through a window into the home, Deputy Benson saw Allgood moving within the residence, and announced to the other officers, "He's going out the back. He's going out the back." Based on Benson's comments, Deputy Johnson began running along the fence toward the back of the house. Then Sergeant Durand announced, "He's going to the garage," and began heading toward the front of the residence. Being closest to the front of the residence and the garage, Deputy Fayerweather similarly hopped back over the fence and headed toward the garage with his taser unholstered. Finally, Mangine and K-9 Ash also headed to the front of the residence where the garage was located and hopped the fence.

Upon arriving at the front of the garage, Fayerweather saw that the garage door was opening and announced, "Got a garage door opening!" Once the garage door was about

6

halfway open, Allgood ducked under the door and began exiting the garage. Fayerweather immediately raised his taser and yelled, "Ronald, step down!" According to Fayerweather, he could see that Allgood had something in one of his hands but could not tell what it was, while Allgood says he was clearly holding a cell phone. The body camera footage does not resolve what Allgood was holding.[5] Once Allgood exited the garage, he said, "Let's go, and began walking briskly in the direction of Fayerweather and a parked police vehicle. Deputy Fayerweather twice more yelled, "Ronald! Stop!" However, Allgood continued walking.

Just as Fayerweather ordered Allgood to stop the second time, Deputy Mangine and K-9 Ash arrived in front of the residence. Mangine saw Allgood walking toward Fayerweather and heard him yell a third time, "Stop!" Allgood did not stop walking. According to Deputies Fayerweather and Mangine, once Allgood was within one or two feet of Fayerweather, Allgood reached out one of his hands and pushed away the taser, causing them to believe Allgood was attempting to knock the taser from Fayerweather's hand. Allgood denies reaching for Fayerweather, and unfortunately, the video footage does not clearly show what Allgood was doing with his hands. Regardless, Fayerweather then tripped Allgood, bringing him to the ground and hooking his left arm under Allgood's right

---

[5] Allgood also represents that his hands were raised and he told Fayerweather that he was coming out, but it *is* clear from the camera footage that: his hands were *not* raised when he exited the garage; and he did *not* say that his hands were up or that he had a phone. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," a court should not adopt the contradicted version for purposes of ruling on a motion for summary judgment); *U.S. v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022) ("a video record of the events at issue can evaporate any factual dispute that would otherwise exist").

arm. At the same time, Mangine commanded K-9 Ash to "engage" (bite) Allgood.[6] Ash then bit Allgood's calf as Fayerweather brought Allgood to the ground. Although Allgood asserts that Mangine ordered Ash to bite him after he was already subdued on the ground, the video footage confirms that Ash bit Allgood *at the same time* Fayerweather brought him to the ground.

Seconds before, Sergeant Durand had come around the front of the house, just in time to see Allgood walking toward Fayerweather, then being brought down by Fayerweather and Ash. In taking Allgood to the ground, Durand also saw that Fayerweather had lost control of his taser and began yelling at Allgood, "Give me my taser! Give me my taser!" According to both Durand and Fayerweather, Allgood was attempting to take the taser, while Allgood claims only to be reaching for Fayerweather's wrist. Here, the video footage shows that Allgood was grabbing near Fayerweather's wrist *and* taser, and while unclear whether he was actually reaching for the taser, an objectively reasonable officer would almost certainly act on that concern until the risk was neutralized. It *is* clear that the taser slipped out of Fayerweather's hand at some point in the scuffle, and Durand was ultimately able to grab it, while around this time, Deputies Johnson and Benson also arrived at the front of the house.

At this point, Allgood was lying face-up on the ground, with Deputy Fayerweather straddling his chest and Ash biting his leg. Mangine remained next to Ash, keeping one hand on Ash and one on Allgood's leg. Further, defendants Durand, Johnson and Benson

---

[6] Because Mangine's cell phone was ringing loudly at the time, it is also not possible to tell from the body camera footage whether Deputy Mangine warned plaintiff again that Ash would bite him, although he had already warned Allgood more than once by this point that being bitten by the K-9 was a distinct possibility.

8

were also attempting to secure his hands and legs, while Allgood said, "Get that dog off my leg." In reply, Mangine explained that the dog was "not coming off until you stop resisting." The deputies continued to yell, "stop resisting," although Allgood maintains he was no longer physically *able* to resist. In particular, Mangine claims to have been concerned that if he released Ash's hold on the leg, *he* would lose control of the leg and Allgood could move again. Once Durand stated to the deputies, "Alright, he's in cuffs," Mangine said, "Alright, dog is coming straight back." After the other deputies moved back, Mangine commanded Ash to "out" (release Allgood's leg and Ash immediately did so.) In total, Ash had bitten Allgood for approximately 58 seconds.[7]

OPINION

Plaintiff Allgood claims a reasonable jury could find on this record that Deputy Mangine used excessive force when he ordered his canine partner Ash to bite him and hold the bite for nearly a minute. Plaintiff also claims a reasonable jury could find that the other deputies should have intervened to either prevent the bite or at least direct Mangine to release the dog within a few seconds of engaging Ash because a reasonable officer would have concluded further control with six other officers engaged in subduing the 60 year old plaintiff was excessive.[8] Plaintiff's excessive force claim originates from the Fourth

---

[7] Plaintiff represents that Ash's bite was the "longest 58 second of his life," but beyond this pain and suffering, he offers no evidence of any physical, permanent injury.

[8] In his complaint, plaintiff further pleaded excessive force claims against the other deputies, as well as municipal liability claims against St. Croix County. (Dkt. #1.) However, plaintiff's brief in opposition to summary judgment focused almost exclusively on the actions of Deputy Mangine and K-9 Ash, while failing to respond to defendants' arguments regarding his claims against the other deputies and the County. Defendants are entitled to summary judgment on those claims based on plaintiff's failure to meaningfully rebut any of defendants' arguments. *See Bradley v. Vill. of Univ.*

9

Amendment's protection against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). An officer's use of force is analyzed under an objective reasonableness standard, which "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Among other possible factors, an officer's use of force is judged by: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* The officer's action must also account for "the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (citation omitted).

Defendants contend that their actions did not violate the Fourth Amendment, and even if they did, they are entitled to qualified immunity. The court will address qualified immunity first, as that issue is dipositive in this case. *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 654 (7th Cir. 2024) (district court may resolve case on qualified immunity without addressing underlying constitutional violation). Qualified immunity shields government officials from monetary liability unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011). The doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials

---

*Park, Illinois*, 59 F.4th 887, 897 (7th Cir. 2023) (arguments waived if underdeveloped, conclusory, unsupported by law or not raised at all).

from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

When a defendant asserts qualified immunity at the summary judgment stage, the *plaintiff* has the burden of defeating it by showing that a defendant violated a clearly established statutory or constitutional right. *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021). To be clearly established, the right must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Schimandle*, 114 F.4th at 655. At this step, the United States Supreme Court has frequently cautioned against defining that right at too high a level of generality, rendering the defense of qualified immunity relatively meaningless. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). Moreover, the Supreme Court has emphasized the importance of applying qualified immunity correctly in excessive force cases, an area of the law "in which the result depends very much on the facts of each case." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam); *see also City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) ("[I]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.") (citation and quotation marks omitted). Thus, police officers are entitled to qualified immunity in Fourth Amendment excessive force cases "unless existing precedent squarely governs the specific facts at issue." *Cibulka v. City of Madison*, 992 F.3d 633, 639 (7th Cir. 2021). And to overcome qualified immunity in an excessive-force case, plaintiff must either: (1) identify a closely analogous case that established a right to be free from the type of force the police officers used; or (2)

11

show that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. *Id.*

Here, plaintiff argues that it was clearly established law that "police officers could not use significant force on nonresisting or passively resisting suspects." (Plt.'s Br. (dkt. #59) 19–20.) Plaintiff relies principally on *Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016), and *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016), for this principle, two cases involving canine police partners. However, the general proposition that "officers cannot use significant force on a nonresisting or passively resisting suspect" is insufficiently specific, by itself, to govern the outcome of this case. Indeed, such a reading would run headlong into the Supreme Court's repeated warning "not to define clearly established law at too high a level of generality" for purposes of a qualified immunity analysis. *E.g.*, *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 2 (2021). Similarly, the Seventh Circuit has specifically held that "framing the right" in the excessive force context "as the right to be free from force once subdued is impermissibly broad." *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024); *see also Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025) (framing constitutional right as "deadly force cannot be used when there is no longer an imminent threat of danger" is "too high a level of generality").

Regardless, neither the facts in *Becker* nor in *Alicea* "squarely govern" the specific facts at issue here. *See Manery*, 124 F.4th at 1081 ("Because the inquiry into whether an officer used excessive force is highly fact-dependent, police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue.") (citation omitted) (emphasis added). In *Becker*, police officers went to Becker's mother's home to execute an arrest warrant, based on reports of his having threatened to kill someone with

a knife three weeks earlier. *Id.* at 923. From the front porch, Becker's mother "called upstairs to her son that the police were there to arrest him." *Id.* In that case, the parties disputed whether an officer gave warnings before releasing his canine partner into the home. Moreover, according to Becker, "within two minutes of his mother's announcement, he began descending the stairs" from his upstairs bedroom, "with his hands on top of his head so officers knew he was surrendering." *Id.* at 924.

Nevertheless, as Becker was descending, the officer released his canine, which reached Becker as he was still three steps from the bottom of the stairs. The dog bit Becker's ankle, and Becker shouted, still with his hands up, "Call the dog off. I'm coming towards you." *Id.* Even after the K-9 officer reached Becker and the dog, there was no command for the dog to release Becker. Instead, the officer "grabbed Becker . . . and yanked him down the last few steps onto the floor, where he landed hard on his chest and head." *Id.* According to Becker, the dog then continued to bite him for several minutes, "while violently shaking his head," only to be released after Becker was handcuffed. *Id.* Finally, Becker had to undergo surgery and stay in the hospital for two or three days to recover, and he suffered severe permanent muscle and nerve damage as a result of the incident. *Id.* at 925.

In *Alicea*, the facts were even more egregious. The defendant-officer ordered his K-9 partner to attack a burglary suspect who was standing still, arms raised, inside of an empty above-ground pool, surrounded by five-foot walls, and who had immediately complied with police orders. 815 F.3d at 289–90. Further, the officer had his gun drawn and trained on the plaintiff the entire time as he stood in the swimming pool, "effectively

13

trapped." *Id.* at 290. On those facts, the plaintiff did not pose a sufficient threat to justify ordering a police K-9 to attack and hold him.

The facts of both *Becker* and *Alicea* are clearly distinguishable from the present case. Becker involved a suspect who had announced that he was complying with officer commands *and* walked toward the officer with his hands on his head. His alleged crime, threatening someone with a knife, had occurred several weeks earlier, and there was no reason to suspect that he was armed or in a position to attack police at the time of the arrest. *Id.* at 927. Nonetheless, and without warning, the officer ordered his K-9 partner to bite the suspect for several minutes, causing permanent damage. Similarly, the burglary suspect in *Alicea* had complied with officer commands, had his arms raised, held no weapon, and could not flee or attack without first having to vault out of a swimming pool.

In contrast, defendant Mangine knew that plaintiff's arrest warrant was for threats to law enforcement, and he, his sergeant and the other deputies had been told that plaintiff had a history of anger, verbal abuse and violent threats to law enforcement, including a threat to break a law enforcement officer's neck and use a knife on a K-9 officer. Mangine also knew that plaintiff had: refused to comply with numerous officer commands that he surrender; argued with deputies for several minutes; told deputies to "shoot first" at one point; and locked himself in his house for a time. Worse still, by the time Mangine ordered his K-9 partner to apprehend him, plaintiff was walking, without his hands visible to Mangine, at a steady pace toward another officer who was shouting for him to stop. Further, unlike the suspects in *Becker* and *Alicea*, plaintiff at *no* point put his hands in the air or said that he would comply with officer commands. If anything, his comments and actions were consistent with *non*-compliance all throughout. Thus, the officers were not

14

required to interpret his behavior or statements as any kind of compliance or surrender, passive or otherwise, under the case law.  Finally, although plaintiff argues that Mangine, or another officer, should have ordered Ash to release him earlier, Mangine reasonably believed that plaintiff *remained* a danger given the ongoing confusion over Fayerweather's taser and resistance, interrupted by a few moments when he *may* have been thinking about complying but never did.

Specifically, Mangine observed plaintiff, Fayerweather and Durand struggling over Fayerweather's taser, and it is clear from the camera footage that plaintiff continued to move as the deputies attempted to place him into handcuffs.  Plaintiff does not dispute that he moved, but says his actions were his "body's instinctual reaction to the pain of being bitten."  (Plt.'s Resp. to DPFOF (dkt. #55) ¶ 121.)  Nonetheless, Mangine was entitled to err on the side of caution, given the uncertainty and threat posed by plaintiff historically *and* as a result of his erratic, potentially dangerous behavior as he repeatedly resisted arrest.  And while Deputy Mangine *may* have been able to release Ash safely sooner, there is *no* caselaw, much less controlling law, clearly holding that he must do so until confident that plaintiff was secured in handcuffs.

Certainly, the *Becker* and *Alicea* cases involved an officer commanding a K-9 partner to bite a suspect, but the similarities between the cases end there.  Not every reasonable officer familiar with *Becker* and *Alicea* would have known that commanding a K-9 to apprehend and hold a suspect under the circumstances here would be a Fourth Amendment violation.  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.")  Instead, this case is more analogous to *Johnson v. Scott*, 576 F.3d

658 (7th Cir. 2009), in which the Seventh Circuit affirmed summary judgment where a police officer, in pursuit of a fleeing suspect, released his dog to assist in running the suspect down. Despite the suspect throwing his hands up and saying, "I give up," shortly after the dog release, it bit and held him as the officer caught up to make an arrest. *Id.* at 659. The officer further struck the suspect to subdue him, because he interpreted his continued struggle with the dog as resistance. *Id.* Thus, the Seventh Circuit held that the officer's split-second decision to use force was reasonable to apprehend a suspect in active flight because "not all surrenders are genuine . . . the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." *Id.*

In this instance, as in *Johnson*, defendants faced a situation that was tense, uncertain and rapidly evolving with a suspect who was known to be threatening, had resisted in the past *and* was actively resisting up to and after the dog was released (or at least a reasonable officer could objectively believe) -- precisely the context in which the Supreme Court has counseled courts to make allowances for on-the-scene decisions about the amount of force that is necessary, "even if it may later seem unnecessary in the peace of a judge's chambers[.]" *Graham*, 490 U.S. at 396–97. However unfortunate the outcome of this incident may have been for the plaintiff, it was largely of his own doing, and not every reasonable officer should have known that defendants' conduct under the circumstances was objectively, beyond question, a violation of the Fourth Amendment. Thus, defendants are entitled to qualified immunity and summary judgment.

16

ORDER

IT IS ORDERED that defendants motion for summary judgment (dkt. #37) is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 14th day of May, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge